**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARTIN HYATT, | ) | CASE NO. 5:09CV81 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| ANDREA L. NORRIS, ESQ., et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

Before the Court is defendant's motion for summary judgment (Doc. No. 43), plaintiff's memorandum in opposition (Doc. No. 46), and defendant's reply (Doc. No. 51). For the reasons set forth below, the motion is **GRANTED**.

## I. BACKGROUND

On January 21, 2009, plaintiff Martin Hyatt ("Hyatt"), the former Chief Deputy Clerk of Barberton Municipal Court, sued Andrea L. Norris ("Norris"), the former Clerk of Barberton Municipal Court, and Barberton Municipal Court. Although the original complaint contains three causes of action, the only claim currently remaining in the lawsuit is plaintiff's claim in count three of the complaint, brought against Norris in her individual capacity under 42 U.S.C. § 1983, alleging that his employment was terminated in violation of his first amendment right to association. (Compl. ¶ 20.)[1]

[1] Barberton Municipal Court was previously dismissed in its entirety, as was any claim against Norris in her official capacity; counts one and two were also dismissed. (*See* Doc. No. 14.)

In January 2004, after she was elected Clerk of Barberton Municipal Court,[2] Norris hired Hyatt, a longtime friend,[3] as her Chief Deputy Clerk. (Compl. ¶ 5; Hyatt Dep. at 13.) In his role as Chief Deputy Clerk, Hyatt supervised eight to ten deputy clerks and was generally responsible for running the daily operations of the clerk's office. (Hyatt Dep. at 49, 53.) Norris testified that Hyatt "stood in [her] shoes when [she] was absent from the office." (Norris Dep. at 59.) Up until July 2007, Norris had no problems with Hyatt's performance as Chief Deputy Clerk. (Norris Dep. at 67, 70.)

On a Saturday in July 2007, Hyatt and an employee that he directly supervised had sexual intercourse in a storage room at the courthouse in which the clerk's office is located. (Hyatt Dep. at 61.) Regretting what he had done (or perhaps fearful because there may have been a tape recording of the sexual encounter), on the following Monday Hyatt told Norris about the encounter. (Norris Dep. at 67-68; Hyatt Dep. at 64.) Norris was both shocked and disappointed. She also believed Hyatt's indiscretion would cause serious problems for her office, a fact which Hyatt understood. In fact, Hyatt feared that he might lose his job as a result of his behavior. (Hyatt Dep. at 67, 75.)

After consideration, Norris decided to suspend Hyatt without pay for the month of August 2007. She took away his title as Chief Deputy and all his supervisory authority over any other employees; she also cut his pay due to his reduced responsibilities. Hyatt understood that he was no longer allowed to discipline employees. (Norris Dep. at 69; Hyatt Dep. at 77, 111.)

When he returned to work in September 2007, Hyatt did not adjust well to his reduced responsibilities and authority. Norris observed Hyatt being "angry with customers and

[2] Norris resigned her position as Clerk in May 2009. (Norris Dep. at 17.)

[3] Norris testified that she knew Hyatt for almost twenty (20) years at the time she hired him. She considered him a close friend. (Norris Dep. at 24.)

rude and yelling at employees." (Norris Dep. at 70.) On one occasion when she observed this, she sent another employee to "relieve[ ] [him] at the front counter because of his demeanor." (Norris Dep. at 70.) In general, Norris believed that, beginning in September 2007, Hyatt "had difficulty [. . .] being around [her] and communicating with [her.]" (Norris Dep. at 72.) Sometimes when she spoke to him directly, "he would not speak back[.]" (Norris Dep. at 73.) He also continued to try to discipline employees although that duty had been taken from him. One employee even complained to Norris about the fact that Hyatt had "yelled" at her. (Norris Dep. at 78-79.) Kelly Thrasher, the employee who had taken over Hyatt's supervisory responsibilities (Norris Dep. at 119-20), reported to Norris that when she reprimanded him for disciplining employees, he purportedly said: "What the f*** am I supposed to do then?" (Norris Dep. at 79.) As early as October of 2007, other employees were expressing concern about Hyatt and Norris felt that he "seemed resentful of the fact that he no longer made the money he was making[.]" (Norris Dep. at 106, 107.)

Thrasher also stated that, after he returned from his suspension, Hyatt "often demonstrated an angry and hostile attitude toward co-workers and customers[ ]" and once told her "that he 'could not stand not being in control' of the office." (Thrasher Aff. ¶ 3.)[4] Thrasher further stated that, on one occasion, she saw Hyatt disregard Norris's removal of his supervisory authority when "he attempted to discipline a co-worker and interject[ed] himself into their [sic] discipline." (Thrasher Aff. ¶ 4.) Thrasher also noted that from September 2007 on, "Hyatt's working relationship with Andrea Norris deteriorate[d]" and "[b]y early 2008, he and [Norris]

[4] Plaintiff has moved to strike Thrasher's affidavit, arguing that it does not provide specific facts admissible in evidence, gives opinions only, and does not meet the Rule 56 requirement of personal knowledge. While there may be isolated portions of Thrasher's affidavit that fit this description, the entire affidavit need not be stricken. The Court is certainly capable of simply disregarding portions of the affidavit that may be unacceptable for purposes of summary judgment. Accordingly, to the extent Doc. No. 48 seeks an order striking Thrasher's entire affidavit, the motion is **DENIED**.

barely spoke at work." (Thrasher Aff. ¶ 6.) Hyatt also did not speak to Thrasher and the "situation adversely affected the work environment[.]" (Thrasher Aff. ¶ 6.) In Thrasher's view, "the office could not have functioned appropriately on a long term basis, in those circumstances." (Thrasher Aff. ¶ 6.)

Seeing that the new arrangement was not working out, Norris finally decided to terminate Hyatt's employment. To that end, in November or December of 2007, she discussed with Joseph Stefan whether he would be interested in the Chief Deputy position. (Stefan Aff. ¶ 2.)[5] She also made clear to Stefan that Hyatt was going to be terminated and that she was considering him (Stefan) as well as other candidates for the position of Chief Deputy.[6] (Stefan Aff. ¶ 3.)[7]

On or about April 21, 2008, Norris and her attorney Randy Briggs met with Hyatt to tell him his employment was being terminated. Hyatt was given a letter dated that same day indicating that the termination was "effective immediately" and stating that he no longer met the "obligations and requirements[ ]" of the position of Chief Deputy, which were "of a fiduciary nature[.]" (Norris Dep. at 88; Exh. 1.) When Hyatt questioned the termination, Norris told him: "We don't have any communication between us anymore. Makes it difficult for us to work together[.]" (Norris Dep. at 122.) Hyatt was told to leave the premises and Norris returned to her office. Instead of leaving, Hyatt went to Norris's office, but when he saw her there he left

---

[5] Doc. No. 48 also seeks an order striking the affidavit of Joseph Stefan, arguing that it is no more than hearsay. The motion, however, is **DENIED**. (*See*, note 4, *supra*.)

[6] Norris discussed the position with Diane Sheritan, the City's planning director, but she was not interested because the pay was too low. (Norris Dep. at 108-109.) Norris also interviewed Andy Padrutt and ultimately hired him for the position of Chief Deputy. (Norris Dep. at 109-11.)

[7] Norris also testified at her deposition that, after she had already decided to terminate Hyatt, she was called to the office of Judge Macko who complained that Hyatt had "a very bad attitude." (Norris Dep. at 99.) There was even some question as to whether he had written an obscenity on a case file. (Norris Dep. at 100.)

without saying anything. Hyatt then went to Judge Macko's office and told him he planned to sue Norris. (Norris Dep. at 123.)

Hyatt attributes significance to the *timing* of his termination and alleges it was in violation of his first amendment right of association and in retaliation for his exercise of that right. His assertion arises from the fact that his wife, Michele,[8] who was a former employee of First Security Title,[9] a company co-owned by Norris and her husband,[10] had been indicted in December 2007, along with other defendants, in a criminal case involving mortgage fraud in Summit County.

Hyatt and his wife had a long-standing business relationship with David Willan, who owned a company called Evergreen Investments. Willan and Evergreen were the main targets of the mortgage fraud prosecution. Michele Hyatt had performed services for Willan and his company before, during and after her employment at First Security Title and this apparently led to the criminal charges against her. (Hyatt Dep. at 14-23; 115-22.)

On April 15, 2008, Michele Hyatt's criminal defense attorneys caused a subpoena to be served on Chase Bank requesting the bank to produce certain records relating to the banking activities of the Office of the Barberton Clerk of Courts. (Hyatt Dep. at 125-28). No one has ever explained how (or even if) the subpoenaed records related to the mortgage fraud charges. Hyatt himself has no idea. (Hyatt Dep. at 113.)

---

[8] Norris also considered Michele a good friend, indicating that they had golfed together even after Michele left her position at First Security Title; however, over time the friendship ended because they had "different interests[.]" (Norris Dep. at 154, 157.)

[9] Michele Hyatt left the company voluntarily in March 2007, after being granted a requested leave of absence. She was never invited back. (Norris Dep. at 46.)

[10] Although Norris is a co-owner of First Security Title, she has little direct involvement with the company. (Norris Dep. at 30.)

Hyatt claims that it was the service of this subpoena by his wife's attorneys that led to his termination by Norris. However, he admits that, shortly after the subpoena was served, when Norris spoke to him about it, she only questioned how the clerk's bank records would have any relevance in Michele's criminal case. He has no particular recollection of Norris's demeanor during that conversation. (Hyatt Dep. at 122-23.) Norris herself had very little knowledge of the subpoena other than that she learned of it about April 15, 2008, a week before she terminated Hyatt's employment. (Norris Dep. at 99.) She also noted that she did not attempt to have the subpoena quashed. (Norris Dep. at 95.)[11]

## II. DISCUSSION

### A. Summary Judgment Standard

When a party files a motion for summary judgment, it must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(3). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial." Rule 56(e)(2). Affidavits filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would

[11] Hyatt also produced during discovery a copy of notes he took following a conversation with Norris on February 14, 2008. The notes indicate that Norris was "very mad" about something Michele had said at her arraignment which Norris perceived as a personal attack on her. Norris purportedly told Hyatt that attempting to "drag her into Michele's case was a huge mistake[.]" (Hyatt Dep. at 87-88.) However, Hyatt testified at his deposition that he did not perceive this conversation as any threat to his job, but rather as "a threat to Michele's case." (Hyatt Dep. at 93.) Norris also remembers this conversation. She admits that she was confused and upset because Michele's lawyer had made a statement in court to the effect that Norris should be indicted because she was the one who controlled everything. (Norris Dep. at 91-94.) She acknowledged that she told Hyatt she thought "they were making a mistake by attacking [her,]" but she also assured him that she "would not do anything to hurt his wife[.]" (Norris Dep. at 92.)

be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Rule 56(e)(1).

**B. Analysis**

"To state a claim for relief in an action brought under § 1983, [plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Gritton v. Disponett*, 332 Fed. Appx. 232, 237 (6th Cir. 2009) (quoting *American Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999)).

> In order to establish retaliation for engaging in constitutionally protected activity, a plaintiff must prove the following elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two--that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (en banc). In brief, this analysis focuses on whether the adverse employment action was motivated in substantial part by the plaintiff's constitutionally protected activity. *See Mattox v. City of Forest Park*, 183 F.3d 515, 520-21 (6th Cir.1999). If the plaintiff meets her burden, the burden then shifts to the defendants to prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. *See Kreuzer v. Brown*, 128 F.3d 359, 363 (6th Cir.1997), *cert. denied*, 523 U.S. 1121, 118 S.Ct. 1802, 140 L.Ed.2d 941 (1998); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

*Sowards v. Loudon County, Tenn.*, 203 F.3d 426, 431 (6th Cir.), *cert. denied*, 531 U.S. 875 (2000).

Plaintiff claims that his employment was terminated in April 2008 because his wife's criminal defense attorneys served a subpoena requesting bank records of the Clerk of Court, i.e., defendant Norris. Therefore, he asserts that he was fired in retaliation for being married to a person who brought Norris's name into a criminal prosecution, and thereby arguably

implicated her in that criminal case. (Compl. ¶¶ 7, 9.) Plaintiff characterizes his termination as "retaliatory in nature, taken under color of law, meant to punish [him] for the acts of his wife and her lawyers in seeking to protect and enforce the rights of [his] wife in an unrelated criminal defense case and to penalize [him] for having a marital association with his wife." (Compl. ¶ 10.)[12]

Termination of employment because of one's marital relationship (i.e., because of protected conduct) *can* violate the Constitution if there is an "undue intrusion by the state into the marital relationship." *Clark v. Alston*, 442 F.Supp.2d 395, 400 (E.D. Mich. 2006). In *Clark*, plaintiff's offer of employment as a probation officer was rescinded by a judge when he learned, after plaintiff had already accepted the job offer, that plaintiff was married to a former inmate with whom she had had a relationship while she was a corrections officer at a prison in Michigan. Plaintiff never revealed this fact during her job interview because she maintained that her relationship had not been improper while she was a corrections officer (since it involved only the exchange of letters and gifts) and that she had become intimate with and married the inmate only after she left her job as a corrections officer. Clark relied on *Sowards* wherein a sheriff fired an employee simply because her husband ran against the sheriff in an election, although unsuccessfully. The *Clark* court discussed the difference between the undue intrusion in the *Sowards* case (where there was no rational basis to conclude that the marriage relationship would have adversely affected Sowards's employment) and intrusion that was not undue in the case of

[12] In paragraph 11 of the Complaint, Hyatt cites two cases as support for the proposition that "[a]n employer may not terminate an employee for a reason related to being married to a person who seeks to protect and enforce her legal rights through the subpoena process of a Court." These cases are *Moskowitz v. Progressive Ins. Co.*, 128 Ohio Misc.2d 10, 811 N.E.2d 174 (Ohio Com. Pl. 2004) and *Terrell v. Uniscribe Professional Services, Inc.*, 348 F.Supp.2d 890 (N.D. Ohio 2004). Neither case applies. Aside from the fact that they both asserted state law claims of wrongful discharge in violation of public policy, not § 1983 claims, they also both involved situations where employees themselves were attempting to enforce legal rights and were terminated as a result of such behavior. Here, as will be discussed below, it was Hyatt's wife who was exercising legal rights, not Hyatt.

*Montgomery v. Carr*, 848 F.Supp. 770 (S.D. Ohio 1993) (where there was a rational basis for the transfer of one spouse to a different school pursuant to the district's anti-nepotism policy). The *Clark* court noted that "the mere fact that an employer uses an individual's marital relationship in an employment decision will not *always* constitute an undue or impermissible intrusion into the marital relationship." *Clark*, 442 F.Supp.2d at 401 (emphasis in original). It concluded that there was no undue intrusion because the judge's concern about the personal relationship that had obviously existed between an inmate and Clark, a corrections officer, "would be a legitimate business reason for denying employment." *Id*.

The instant case is completely distinguishable from *Sowards* and *Montgomery* and more in line with the holding in *Clark* because the record clearly reflects that the motivation for Norris's firing of Hyatt was not that he was married to a woman whose lawyers were arguably causing some disruption in Norris's life, but rather a legitimate business reason, namely, his own job performance, particularly his hostile attitude after he was demoted for having a sexual relationship with an employee that he had supervised.[13]

Further, the mere fact that he was terminated one week after Norris became aware of the subpoena also does not preclude summary judgment,[14] provided Norris can show that she

[13] The Court earlier denied in part defendant's motion to dismiss, allowing the claim against Norris in her individual capacity to survive. The Court did so in reliance on *Adkins v. Board of Educ. of Magoffin County, Ky.*, 982 F.2d 952 (6th Cir. 1993) where a school secretary was fired as punishment for the behavior of her husband, a school principal who had refused to create negative documentation on certain teachers that the superintendent wanted to terminate. The superintendent actually told the woman: "I can't get rid of [your husband], and you're the next best thing." *Id*. at 954 (quoted in Doc. No. 14, at 11.) In denying the motion to dismiss on this one claim, the Court stated that it had "no opinion as to whether, following discovery, plaintiff will be able to survive a motion for summary judgment." (Doc. No. 14, at 11.) Discovery in this case has not, however, revealed any real connection between the termination of plaintiff and the subpoena served as part of his wife's criminal investigation.

[14] Courts differ on whether temporal proximity, standing alone, is sufficient to establish the causal connection necessary for a *prima facie* case. *See Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523-26 (6th Cir. 2008) (discussing cases). Often, the shorter the time period between the protected activity and the adverse employment action, the more likely a court is to determine, especially on summary judgment, that causation has been established for purpose of the *prima facie* case.

would have made the decision to terminate Hyatt's employment notwithstanding any protected conduct. *Board of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 675 (1996) (to prevail in a first amendment retaliation claim, "an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination. If the employee discharges that burden, the [employer] can escape liability by showing that it would have taken the same action even in the absence of the protected conduct.") (citing *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977)).

In this case, the record reflects that Norris had already made the decision to terminate Hyatt by November 2007, although it took until April 2008 to find his replacement. This decision was based on his continued unacceptable behavior after he returned to work following his suspension and it pre-dated any protected activity that he and/or his wife might have engaged in.[15] Hyatt himself asserts that Norris first indicated her "anger" (or "hurt," in Norris's view) related to Michele's case in February 2008. This conversation occurred after Norris had already decided to terminate his employment and two months before the subpoena was served.

It is clear from the record that Norris, who considered herself Hyatt's friend, decided to give him a second chance when he confessed a sexual affair with a person he supervised. Norris would certainly have been completely justified in terminating his employment immediately, but she chose to simply remove his supervisory duties, suspend him for one month, and reduce his pay. Hyatt squandered that second chance and developed an attitude and behaviors that were disruptive in the office as early as September 2007, causing Norris to decide by November 2007 to terminate his employment once she was able to find a replacement. These

[15] Michele Hyatt was indicted in December 2007 and the subpoena in her case was served in April 2008.

facts are evident from the affidavits of Thrasher and Stefan, as well as Norris's deposition, and are unrefuted.

Thus, even if the Court were to assume for the sake of the instant motion that Hyatt had established his *prima facie* case (which is difficult to do since the causation element cannot be established), Norris has shown a legitimate business reason for her decision to terminate Hyatt and this reason pre-dated any protected activity. Hyatt has simply failed to establish that his employment was terminated for an unlawful reason and, therefore, Norris is entitled to summary judgment.

## III. CONCLUSION

For the reasons discussed above, Norris is entitled to summary judgment on the sole remaining claim. Doc. No. 43 is **GRANTED** and this case is dismissed.

**IT IS SO ORDERED**.

Dated: December 29, 2009

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**